# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| Headwater Research LLC, | CASE NO.   2:25-cv-00904 |
| *Plaintiff,* | |
| vs. | **Complaint for Patent Infringement** |
| CHARTER COMMUNICATIONS, INC., CHARTER COMMUNICATIONS OPERATING, LLC, SPECTRUM MANAGEMENT HOLDING COMPANY, LLC, SPECTRUM GULF COAST, LLC, AND CHARTER COMMUNICATIONS, LLC, | **JURY DEMANDED** |
| *Defendant.* | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Headwater Research LLC ("Headwater") files this complaint against Defendants Charter Communications, Inc., Charter Communications Operating, LLC, Spectrum Management Holding Company, LLC, Spectrum Gulf Coast, LLC, and Charter Communications, LLC (collectively, "Spectrum" or "Defendants"), alleging infringement of U.S. Patent Nos. 9,179,359; 9,277,445; and 9,609,544. The Accused Instrumentalities are mobile electronic devices, including mobile phones and tablets used, made, offered for sale, sold, and/or imported by Defendants in the United States and supplied by Defendants to customers in the United States, that operate on Defendants' network, such as Defendants' mobile virtual network operator (MVNO) Spectrum Mobile.

## BACKGROUND

1.      This complaint arises from Defendants' infringement of the following United States patents owned by Headwater, each of which relate to wireless communications technology: United States Patent Nos. 9,179,359 ("the '359 patent"), 9,277,445 ("the '445 patent"), and 9,609,544 ("the '544 patent"), (collectively, "Asserted Patents").

2.      Dr. Gregory Raleigh—the primary inventor of the Asserted Patents—is a world-renowned scientist, inventor, and entrepreneur, with over 25 years of executive experience in several technology sectors including networking, cloud software, consumer services, wireless and military systems. Dr. Raleigh holds Ph.D. and Masters degrees in Electrical Engineering from Stanford University, and a BS in Electrical Engineering from Cal Poly San Luis Obispo. He is the inventor of over 350 issued U.S. and international patents in several fields including radio systems and components, radar, mobile operating systems, cloud services, IoT, networking, consumer electronics, radiation beam cancer therapy and medical imaging.

3.      Dr. Raleigh has a long and distinguished record of significant contributions and advancements in wireless communications technology. His inventions, companies, and products have profoundly and positively impacted virtually every aspect of the mobile device and communications market. In 2005, Dr. Raleigh was named one of the "50 most powerful people in networking" because of his discoveries in wireless communications technology, and his work in multiplying the capacity of a radio link using multiple transmission and receiving antennas to exploit multipath propagation was described as the "most important wireless technology in the works." *See* https://www.networkworld.com/article/2316916/the-50-most-powerful-people-in-networking.html?page=2.

4.      In 1996, while at Stanford University, Dr. Raleigh presented the first mathematical proof demonstrating that multiple antennas may be used with special signal processing techniques to transmit multiple data streams at the same time and on the same frequency while in the presence of naturally occurring multipath propagation. Dr. Raleigh's work at Stanford has been widely adopted in modern multiple-input and multiple-output ("MIMO") radio communication and implemented in major wireless communication standards including 4G and 5G. *See, e.g.*, https://en.wikipedia.org/wiki/Gregory_Raleigh.

5.      Dr. Raleigh's groundbreaking work solved problems that had existed in wireless communication since the late 1800s and overturned a century of research and practice in the fields of radio science and wireless communication theory. His work revealed that a new class of MIMO signal processing architectures would allow wireless devices to transmit multiple data streams at the same time on the same frequency thereby multiplying the information-carrying capacity of wireless networks.

6.      Based on his discoveries, Dr. Raleigh co-founded Clarity Wireless to develop smart antenna products incorporating the advances of his MIMO signal processing architecture, and obtained patents now used in 4G and 5G cellular and Wi-Fi standards. Field trials of the smart antennas developed by Clarity Wireless demonstrated performance significantly above anything else contemplated at the time and continue to set standards for multipath broadband wireless access links. Shortly after those field trials, Cisco acquired Clarity in 1998 and hired Dr. Raleigh to continue to commercialize these technologies.

7.      After leaving Cisco, Dr. Raleigh founded Airgo Networks to develop the world's first MIMO wireless chipsets, networking software, reference design systems and commercial OEM products. Airgo Networks's chipset products significantly improved the speed and reliability of Wi-

Fi, leading to the adoption of its technology as the core of Wi-Fi radio standards since 2006, and adoption of the chipsets into products sold across the globe. In 2006, Qualcomm acquired Airgo Networks and hired Dr. Raleigh to continue to commercialize these technologies. The Airgo team at Qualcomm spearheaded the creation of Wi-Fi standards and developed the first Qualcomm Wi-Fi chips for cell phones.

8.      Dr. Raleigh's innovations at Clarity Wireless, Cisco, Airgo Networks, and Qualcomm, resulted in the widespread adoption of his technologies in a multitude of cellular and Wi-Fi standards, such as LTE, WiMAX, 802.11n, 802.11ac (Wi-Fi 5), as well as 802.11ax (Wi-Fi 6).

9.      After successfully founding and selling Clarity Wireless and Airgo Networks to Cisco and Qualcomm, respectively, Dr. Raleigh shifted his focus from solving radio-centric problems to solving problems in how wireless services are provided to consumers. Dr. Raleigh foresaw significant data demand problems presented by the advent and adoption of smartphones. He sought to solve these data demand problems by improving end-user wireless devices and the services that support them.

10.     In 2008, Dr. Raleigh formed Headwater to develop mobile operating systems and cloud technology, which today, underpin the mobile phone and app industries. The patents in this action describe and claim some of the extraordinary inventions developed by Dr. Raleigh and the Headwater team.

11.     Smartphones and other mobile devices have become ubiquitous and inseparable components of our daily lives, allowing us to make and receive phone calls, get notifications, download music, upload photos, stream entertainment, transact business, exchange ideas, and keep us connected to our family and friends whether they are down the hall or around the globe. Users

can get email, install apps, and browse the internet from these tiny devices by making use of data connectivity services. These devices accomplish these amazing feats by exchanging staggering amounts of data over the internet using wireless and cellular networks, relying on ubiquitous data connectivity to keep users up-to-date and connected.

12.     Since 2011, mobile device data demand has exploded—increasing by almost 400%—with each user consuming approximately 11.5 gigabytes of data per month. In the aggregate, this equates to approximately 90 exabytes of data consumption per month. *See, e.g.*, https://www.ericsson.com/en/reports-and-papers/mobility-report/mobility-visualizer?f=9&ft=2&r=1&t=11,12,13,14,15,16,17&s=3&u=3&y=2011,2027&c=3. For context: a single exabyte of data is equivalent to one billion gigabytes of data. Said another way, if one gigabyte is the size of the Earth, then an exabyte is the size of the sun. *See, e.g.*, https://www.backblaze.com/blog/what-is-an-exabyte/.

13.     And mobile device data demand shows no sign of slowing down. Between now and 2027, mobile data demand is projected to increase more than three-fold, from 90 exabytes per month to a staggering 282 exabytes per month, with each user consuming an average of 41 gigabytes of data each and every month. *See, e.g.*, https://www.ericsson.com/en/reports-and-papers/mobility-report/mobility-calculator?up=2&bp=1&v=0&c=2; https://www.ericsson.com/en/reports-and-papers/mobility-report/mobility-visualizer?f=9&ft=2&r=1&t=11,12,13,14,15,16,17&s=4&u=3&y=2011,2027&c=3.

## Mobile data traffic

Unit: EB/month
All technologies
All devices
Year: 2011 - 2027

Source: Ericsson (June 2022)



All technologies

## Ericsson Mobility Calculator

Your example of calculated
monthly consumption.

**11.45 GB**

World average 2027 average
monthly consumption.

**40.99 GB**



Downloads
Messaging traffic
App traffic
Audio streaming
Video streaming

14.     Also in 2008, Dr. Raleigh founded ItsOn Inc., which licensed Headwater's intellectual property and implemented Headwater's technology into software and services that expanded cellular service plan offerings and improved device and data management capabilities. The tools and technologies delivered by ItsOn allowed carriers to implement Headwater's technologies in end-user devices—such as mobile phones and tablets—opening up new business models while also providing greater flexibility to carriers and device manufacturers, allowing them to reduce costs while simultaneously improving their devices and services.

15.     The Headwater technologies disclosed in the Asserted Patents laid the groundwork for many of the infringing features and functionalities that help device manufacturers, wireless carriers, and customers reduce data usage and network congestion, extend battery life by decreasing power consumption, and enable users to stay connected.

## PLAINTIFF HEADWATER AND THE PATENTS-IN-SUIT

16.     Plaintiff Headwater was formed in 2011 and has been in continued existence and operation since that time. Headwater is a Texas limited liability company organized under the laws of Texas, with its headquarters at 110 North College Avenue, Suite 1116, Tyler, Texas 75702.

17.     Headwater is the owner of U.S. Patent No. 9,179,359, entitled "Wireless end-user device with differentiated network access status for different device applications," which issued on November 13, 2015. A copy of the '359 patent is attached to this complaint as Exhibit 1.

18.     Headwater is the owner of U.S. Patent No. 9,277,445 entitled "Wireless end-user device with differential traffic control policy list and applying foreground classification to wireless data service," which issued on March 1, 2016. A copy of the '445 patent is attached to this complaint as Exhibit 2.

19.     Headwater is the owner of U.S. Patent No. 9,609,544, entitled "Device-assisted

services for protecting network capacity," which issued on March 28, 2017. A copy of the '544 patent is attached to this complaint as Exhibit 3.

## DEFENDANTS AND THE ACCUSED INSTRUMENTALITIES

20.    On information and belief, defendant Charter Communications, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 12405 Powerscourt Drive, St. Louis Missouri, 63131. Charter Communications, Inc may be served at 211 E. 7th Street Suite 620, Austin, Texas 78701.[1]

21.    According to its website, Charter Communications, Inc. serves "operate in 41 states with services available to more than 57 million homes and businesses in markets of all demographics and sizes."[2]

22.    On information and belief, Charter owns or leases, and maintains and operates several stores in this district by and through subsidiary limited liability companies that it manages and controls, including at least Spectrum Gulf Coast LLC, and negotiates and signs agreements on Spectrum Gulf Coast's behalf.

23.    In these stores, Charter Communications, Inc. owns, stores, markets, and sells equipment that perform the Accused Functionalities defined below.

24.    On information and belief, defendant Charter Communications Operating, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 400 Atlantic Street, Stamford, Connecticut 06901. Charter Communications Operating, LLC may be served at 211 E. 7th Street Suite 620, Austin, Texas 78701.[3]

---

[1] https://comptroller.texas.gov/taxes/franchise/account-status/search/32016399597.
[2] https://corporate.charter.com/about-charter.
[3] https://comptroller.texas.gov/taxes/franchise/account-status/search/32066277644.

25.     On information and belief, defendant Spectrum Gulf Coast, LLC is a foreign limited liability company registered in the state of Texas, and organized and existing under the laws of the State of Delaware, with its principal place of business at 12405 Powerscourt Drive, St. Louis, Missouri 63131. Spectrum Gulf Coast, LLC may be served at 211 E. 7th Street Suite 620, Austin, Texas 78701.[4]

26.     On information and belief, defendant Charter Communications, LLC is a foreign limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 12405 Powerscourt Drive, St. Louis Missouri 63131. Charter Communications, LLC may be served at 211 E. 7th Street Suite 620, Austin, Texas 78701.[5]

27.     On information and belief, Charter Communications, Inc. is the corporate manager of its subsidiary LLCs that own or lease property in this district, that employ employees in this district, and that market, own, store, sell, and lease equipment performing the Accused Functionalities in this district. Charter Communications, Inc. has the right to exercise near total control of each entity's operations through its LLC agreements with each entity.

## JURISDICTION AND VENUE

28.     This action arises under the patent laws of the United States, Title 35 of the United States Code.

29.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

30.     Venue is proper in this District under 28 U.S.C. §§ 1391(c) and 1400(b).[6]

31.     Spectrum is subject to this Court's personal jurisdiction consistent with the

---

[4] https://comptroller.texas.gov/taxes/franchise/account-status/search/32048202892.
[5] https://comptroller.texas.gov/taxes/franchise/account-status/search/32016335427.
[6] *Touchstream Tech, Inc. v. Charter Comm, Inc.*, et al., Case No. 2-23-cv-0069-JRG, Dkt. No. 64 (E.D. Tex., May 2, 2024).

principles of due process and/or the Texas Long Arm Statute.

32.     This Court has general and specific personal jurisdiction over the Defendants under the laws of the State of Texas at least because Spectrum has committed acts of infringement within this District giving rise to this action, has a regular and established place of business in this District, and has established minimum contacts with this forum such that the exercise of jurisdiction over Spectrum would not offend traditional notions of fair play and substantial justice. Spectrum, directly and/or through subsidiaries or intermediaries, conducts its business extensively throughout Texas, by shipping, distributing, offering for sale, selling, and advertising its products and/or services in Texas and the Eastern District of Texas, regularly do business or solicit business, engage in other persistent courses of conduct, and/or derive substantial revenue from products and/or services provided to individuals in Texas, and commit acts of infringement of Headwater's patents in this District by, among other things, making, using, importing, offering to sell, and selling products that infringe the asserted patents, including without limitation the Spectrum tablets and phones accused of infringement in this case.

33.     Spectrum, directly and/or through subsidiaries or intermediaries, have purposefully and voluntarily placed one or more products and/or services in the stream of commerce that practice the Asserted Patents with the intention and expectation that they will be purchased and used by consumers in the Eastern District of Texas. These products and/or services have been and continue to be purchased and used in the Eastern District of Texas.

34.     Venue is also proper in this district because Spectrum has a regular and established place of business and has committed acts of infringement in this district.

35.     For example, on information and belief, Spectrum has regular and established places of business at: 4255-A Dowlen Rd, Beaumont, TX 77706, 3121 Edgar Brown Dr, Orange,

TX 77630, 700 Alma Dr, Plano, TX, and 2100 N Dallas Pkwy, Plano, TX.[7]



### Spectrum Store Locations in Texas

| | | | |
|---|---|---|---|
| Arlington (2) | Fort Worth (4) | Lewisville (1) | Richardson (1) |
| Austin (4) | Frisco (1) | Live Oak (1) | Round Rock (1) |
| Beaumont (1) | Garland (1) | McAllen (1) | San Antonio (8) |
| Brownsville (1) | Granbury (1) | McKinney (1) | San Juan (1) |
| Carrollton (1) | Harker Heights (1) | Mesquite (1) | San Marcos (1) |
| Cedar Park (1) | Harlingen (1) | Mission (1) | Temple (1) |
| Corpus Christi (1) | Hurst (1) | New Braunfels (1) | Waco (1) |
| Dallas (3) | Irving (1) | Orange (1) | Wichita Falls (1) |
| Denton (1) | Kyle (1) | Plano (2) | |
| El Paso (3) | Laredo (1) | Port Arthur (1) | |

36.    Spectrum also advertises in the Eastern District of Texas, including but not limited to advertising the geographic coverage of the Spectrum networks within this District. By way of example and without limitation, Spectrum website provides a coverage map that advertises Spectrum current 5G wireless coverage in and around Marshall, Texas.[8]

---

[7] *See, e.g.,* https://www.spectrum.com/locations/tx.

[8] *See, e.g.,* https://www.spectrum.com/mobile/coverage-map.

 

Packages   Internet   TV   Mobile   Home Phone   Business   Contact Us

SPECTRUM 5G AVAILABILITY

# Spectrum Mobile® Coverage Map

Find access to fast, reliable connectivity around the country with the Spectrum Mobile 5G coverage map. Stay connected with nationwide 5G at no extra fee.



## COUNT 1 – INFRINGEMENT OF THE '359 PATENT

37.     Headwater incorporates by reference each of the allegations in the foregoing paragraphs above and further alleges as follows:

38.     Headwater is the owner of the '359 patent with full rights to pursue recover of royalties for damages for infringement, including full rights to recover past and future damages.

39.     The written description of the '359 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

12

40.     Headwater and its predecessors in interest have satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '359 patent, and Headwater is entitled to damages for Defendants' past infringement.

41.     Defendants have directly infringed (literally and equivalently) and induced others to infringe the '359 patent by making, using, selling, offering for sale, or importing products that infringe the claims of the '359 patent and by inducing others to infringe the claims of the '359 patent without a license or permission from Headwater, such as for example inducing any users of the Accused Instrumentalities to perform the patented methods of the '359 patent.

42.     Exhibits 4-5 provides a description of the Accused Instrumentalities and a chart showing examples of how they infringe claim 1 of the '359 patent, which Headwater provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

43.     Defendants knowingly and intentionally induce and contribute to infringement of the '359 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or have been willfully blind to the '359 patent and the infringing nature of the Accused Instrumentalities at least as of the filing and service of this Complaint. As indicated by the Google Patents webpage for the '359 patent, patents assigned to Defendants also cite family members of the '359 patent.

44.     Despite this knowledge, Defendants continue to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '359 patent. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '359 patent, thereby specifically intending for and inducing their customers to infringe the '359 patent through the normal and

customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

45.    Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers, would constitute willful infringement of the '359 patent.

46.    Defendants have induced, and continue to induce, infringement of the '359 patent by actively encouraging others (including its customers) to use, offer to sell, sell, and import the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions on the use of the Accused Instrumentalities; providing the Accused Instrumentalities to customers; and indemnifying patent infringement within the United States.

47.    Headwater has been damaged by Defendants' infringement of the '359 patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

## COUNT 2 – INFRINGEMENT OF THE '445 PATENT

48.    Headwater incorporates by reference each of the allegations in the foregoing paragraphs as if fully set forth herein and further alleges as follows:

49.    Headwater is the owner of the '445 patent with full rights to pursue recover of royalties for damages for infringement, including full rights to recover past and future damages.

50.    The written description of the '445 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how the nonconventional and non-generic combination of claim limitations is patently distinct from

and improved upon what may have been considered conventional or generic in the art at the time of the invention.

51.     Headwater and its predecessors in interest have satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '445 patent, because there are no unmarked articles subject to a duty to mark, and Headwater is entitled to damages for Defendants' past infringement.

52.     Defendants have directly infringed (literally and equivalently) and induced others to infringe the '445 patent by making, using, selling, offering for sale, or importing products that infringe the claims of the '445 patent and by inducing others to infringe the claims of the '445 patent without a license or permission from Headwater.

53.     Exhibits 6-7 provides a description of the Accused Instrumentalities and a chart showing examples of how they infringe claim 1 of the '445 patent, which Headwater provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

54.     Defendants knowingly and intentionally induce and contribute to infringement of the '445 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or have been willfully blind to the '445 patent and the infringing nature of the Accused Instrumentalities at least as of the filing and service of this Complaint. As indicated by the Google Patents webpage for the '445 patent, patents assigned to Defendants also cite family members of the '445 patent.

55.     Despite this knowledge, Defendants continue to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '445 patent. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the Accused Instrumentalities, despite their knowledge of the '445 patent, thereby specifically

intending for and inducing their customers to infringe the '445 patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

56.     Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers, would constitute willful infringement of the '445 patent.

57.     Defendants have induced, and continue to induce, infringement of the '445 patent by actively encouraging others (including its customers) to use, offer to sell, sell, and import the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instruction to its customers; providing the Accused Instrumentalities to customers; and indemnifying patent infringement within the United States.

58.     Headwater has been damaged by Defendants' infringement of the '445 patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

## COUNT 3 –INFRINGEMENT OF THE '544 PATENT

59.     Headwater incorporates by reference each of the allegations in the foregoing paragraphs above and further alleges as follows:

60.     Headwater is the owner of the '544 patent with full rights to pursue recover of royalties for damages for infringement, including full rights to recover past and future damages.

61.     The written description of the '544 patent describes in technical detail each limitation of the claims, allowing a skilled artisan to understand the scope of the claims and how

the nonconventional and non-generic combination of claim limitations is patently distinct from and improved upon what may have been considered conventional or generic in the art at the time of the invention.

62.    Headwater and its predecessors in interest have satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '544 patent because there are no unmarked articles subject to a duty to mark, and Headwater is entitled to damages for Defendants' past infringement.

63.    Defendants have directly infringed (literally and equivalently) and induced others to infringe the '544 patent by making, using, selling, offering for sale, or importing products, services, and systems that infringe the claims of the '544 patent and by inducing others to infringe the claims of the '544 patent without a license or permission from Headwater.

64.    Exhibits 8-9 provides a description of the Accused Instrumentalities and a chart showing examples of how they infringe claim 1 of the '544 patent, which Headwater provides without the benefit of information about the Accused Instrumentalities obtained through discovery.

65.    Defendants knowingly and intentionally induce and contribute to infringement of the '544 patent in violation of 35 U.S.C. §§ 271(b)-(c). For example, Defendants have had knowledge of or has been willfully blind to the '544 patent and the infringing nature of the Accused Instrumentalities at least as of the filing and service of this Complaint. As indicated by the Google Patents webpage for the '544 patent, patents assigned to Defendants also cite family members of the '544 patent.

66.    Despite this knowledge, Defendants continue to actively encourage and instruct their customers to use and integrate the Accused Instrumentalities in ways that directly infringe the '544 patent. Defendants do so knowing and intending that their customers will commit these infringing acts. Defendants also continue to make, use, offer for sale, sell, and/or import the

Accused Instrumentalities, despite their knowledge of the '544 patent, thereby specifically intending for and inducing their customers to infringe the '544 patent through the normal and customary use of the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to their customers; and indemnifying patent infringement within the United States.

67.     Defendants have known, or have been willfully blind to the fact, that making, using, offering to sell, and selling the Accused Instrumentalities to their customers, would constitute willful infringement of the '544 patent.

68.     Defendants have induced, and continue to induce, infringement of the '544 patent by actively encouraging others (including its customers) to use, offer to sell, sell, and import the Accused Instrumentalities. On information and belief, these acts include providing information and instructions on the use of the Accused Instrumentalities; providing information, education and instructions to its customers; providing the Accused Instrumentalities to customers; and indemnifying patent infringement within the United States.

69.     Headwater has been damaged by Defendants' infringement of the '544 patent and is entitled to damages as provided for in 35 U.S.C. § 284, including reasonable royalty damages.

## JURY DEMAND

70.     Headwater demands a jury trial pursuant to Federal Rule of Civil Procedure 38.

## RELIEF REQUESTED

Headwater prays for the following relief:

A.     A judgment in favor of Headwater that Defendants have infringed the Asserted Patents, and that the Asserted Patents are valid and enforceable;

B.    A judgment and order requiring Defendants to pay Headwater past and future damages arising out of Defendants' infringement of the Asserted Patents in an amount no less than a reasonable royalty, costs, expenses, and pre- and post-judgment interest for its infringement of the asserted patents, as provided under 35 U.S.C. § 284;

C.    A permanent injunction prohibiting Defendants from further acts of infringement of the Asserted Patents;

D.    A judgment and order requiring Defendants to provide an accounting and to pay supplemental damages to Headwater, including, without limitation, pre-judgment and post-judgment interest;

E.    A judgement that Defendants' infringement is willful and enhanced damages and fees as a result of that willfulness under 35 U.S.C. § 284;

F.    A finding that this case is exceptional under 35 U.S.C. § 285, and an award of Headwater' reasonable attorney's fees and costs; and

G.    Any and all other relief to which Headwater may be entitled.

Dated:   August 27, 2025

Respectfully submitted,

*/s/ Marc Fenster*

Marc Fenster
CA State Bar No. 181067
Email: mfenster@raklaw.com
Reza Mirzaie
CA State Bar No. 246953
Email: rmirzaie@raklaw.com
Brian Ledahl
CA State Bar No. 186579
Email: bledahl@raklaw.com
Ben Wang
CA State Bar No. 228712
Email: bwang@raklaw.com
Paul Kroeger
CA State Bar No. 229074
Email: pkroeger@raklaw.com
Neil A. Rubin
CA State Bar No. 250761
Email: nrubin@raklaw.com
Kristopher Davis
CA State Bar No. 329627
Email: kdavis@raklaw.com
James S. Tsuei
CA State Bar No. 285530
Email: jtsuei@raklaw.com
Philip Wang
CA State Bar No. 262239
Email: pwang@raklaw.com
James Pickens
CA State Bar No. 307474
Email: jpickens@raklaw.com
James Milkey
CA State Bar No. 281283
Email: jmilkey@raklaw.com
Jason M. Wietholter
CA State Bar No. 337139
Email: jwietholter@raklaw.com
Qi Peter Tong
TX State Bar No. 24119042
Email: ptong@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025

Telephone: 310-826-7474

**ATTORNEYS FOR PLAINTIFF,**
**Headwater Research LLC**